[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 10567
This is a paternity suit filed by the plaintiff mother against the defendant putative father of a minor child, Daniel Ivanina. The defendant had already acknowledged paternity, and it had been confirmed by a blood test agreed upon by the parties before this action was brought.
Plaintiff, however, is also seeking custody and support, and the defendant has counterclaimed first for joint custody and then for sole custody if the court should decline to order joint custody.
Neither party is married to the other. Each is married to another person.
The plaintiff is a Russian born concert pianist who graduated from the Moscow Conservatory for Concert Pianists and Piano Teachers. When she first came to this country, she was married to a countryman, but that marriage ended in divorce around the time she was seeing the defendant. The defendant was also married at the time he began a relationship with the plaintiff but he was separated from his wife. He has been educated as a lawyer and at one time taught law at University of Connecticut Law School. He has not practiced law but is a successful real estate entrepreneur, having accumulated assets of several million dollars up until his voluntary bankruptcy in 1992.
Prior to going with the defendant, the plaintiff had a relationship with a David Michaelson.
When the plaintiff became pregnant with Daniel, the child whose custody is in question, she informed the defendant. His initial response was to request her to have an abortion and to refuse to marry her. Once the plaintiff decided to have the child, the defendant then gave her some support — allowing her the use of an apartment in New York which was under his control and taking her to dinner on occasion. He also attended four of the six Lamaze classes with her. After the birth of Daniel, he paid the lying in and hospital expenses and visited with her and the child in the hospital. CT Page 10568
On leaving the hospital, the plaintiff moved in with David Michaelson and led him to believe he was the father of Daniel.
The defendant insisted that the plaintiff tell Mr. Michaelson who the father was. To solve the problem of doing this, a blood test was suggested and through it paternity of the defendant as Daniel's father was established. Thereafter, the defendant began paying some support for Daniel to the plaintiff (see exhibit 4). During this period and after the plaintiff separated from Mr. Michaelson, the defendant had frequent visits with the child, even visiting on one occasion overnight at the Michaelson home.
The defendant's mother also visited at the plaintiff's invitation or spontaneously.
The plaintiff and Daniel and the plaintiff's sister and her child also visited with the defendant and his wife, with whom he had reconciled, in the defendant's home in Gull Pond in New York state. The plaintiff and the defendant also visited once or twice in Washington and on one occasion the plaintiff had dinner with the defendant and his wife in New York.
During this period the defendant who is a multi millionaire with a home in Washington he valued at over a million dollars and one in Gull Pond, New York he valued at over $250,000.00, was giving the plaintiff as support $250.00 a month plus all of Daniel's expenses that she could itemize.
The plaintiff was living in her mother's house at the time and supporting herself with piano teaching and concerts which provided only minimal income. At one point she asked the defendant to give her money to buy a car. He refused, offering instead to loan her a car he owned and used in New York. On another occasion, when he took the plaintiff to dinner before Daniel's birth, he complained that she ordered the most expensive item on the menu.
It is perhaps this aspect of the defendant's behavior that may very well be at the root of the considerable resentment the plaintiff appears to feel towards the defendant — that plus his refusal to marry her in the first place. CT Page 10569
The defendant testified he wanted to pay for an agent for the plaintiff to enable her to be self-supporting but he was not willing to provide her with sufficient funds to enable her to live as she wished.
While the plaintiff was then dependent on the defendant for most of her income, she did appear to agree with most of the defendant's requests. However once she began a relationship with her present husband, her attitude changed to one of resisting his proposals and complaining about the amount of time Daniel was visiting with the defendant.
The plaintiff's resistance appears to be encouraged by her present husband's rather intense hostility to the defendant exhibited by his refusal to allow the defendant to pick up or drop off Daniel at his and the plaintiff's home after a visit.
On the other hand the defendant has exasperated the situation constantly asking for more time than has been agreed to and on his own terms. His latest motion for visitation illustrates his insistence on more time than has been agreed to and his plan to demand even more time when Daniel is ten — the whole summer for example. Moreover, the defendant's actions in calling Dr. Spotts, the court appointed psychologist, to visit Daniel at his home in New York and then telephoning him for advice has given the court the impression that Dr. Spotts has been coopted by the defendant. It has also succeeded in convincing the plaintiff that Dr. Spotts is not objective but is, indeed, an advocate for the defendant.
Dr. Spotts' reaction to the plaintiff's attitude is to tell himself to "stay away from her." (See testimony of Dr. Spotts, Transcript April 4, 1991, p. 115.)
The result of the problems between the parents is that Daniel is treated differently by each parent. While he has some difficulty with bedwetting, particularly at night, and uses a bottle at night and sometimes during the day, indications, according to Dr. Perlswig, of some emotional problems on the whole, all the experts agree Daniel is doing very well under the circumstances.
The circumstances are that both parents have joint custody under a pendente lite order with support now at $500.00 a month on a voluntary basis by the defendant in addition to CT Page 10570 Daniel's itemized expenses.
The plaintiff has asked for sole custody. The defendant has asked for joint custody or sole if the court declines to award joint. Ordinarily, the court would not award joint custody when the parents are not able to agree on most major aspects of the child's life. However in this case the child has developed a close relationship with both parents. He needs both parents. It is in his best interest to have as much contact as possible with both parents.
The plaintiff, however, has demonstrated her reluctance to encourage Daniel's relationship with the defendant. Even in her prayer for relief she asks that visitation be in Washington only once a month with the other weekends presumably to be spent anywhere else. Visitation has been every other weekend for the past two years and has been in Washington or wherever the defendant wishes to take him. The plaintiff has resisted engaging in counselling to improve their ability to communicate with each other and arrive at agreements on the care of Daniel.
The defendant, on the other hand, while voicing his willingness to encourage a relationship between Daniel and his mother, subtly undermines it, permitting his wife to be called Eemma, a Hebrew word meaning mother, even after the plaintiff had expressed her concern about it, and continuing to do it until an agreement was reached in court to stop it. He also, under the guise of an interested father, constantly suggests how Daniel should be handled by the plaintiff to meet his standards of child rearing, and he has brought the parties into court on at least three occasions since the trial began to obtain additional visitation time or additional holidays or both. In his most recent request for more visits, he had the poor judgment, in the court's, opinion, to ask for more time in the summer than the plaintiff would be able to have, 48 days out of 71. See the court's memorandum on this motion.
In addition, the defendant has also added to his request for the summer visitation that at age 10 Daniel spend the whole summer with him. Finally, he added a request that pick up and delivery of Daniel be at the plaintiff's home which he knew was contrary to the plaintiff's wishes.
The court would not be comfortable awarding either CT Page 10571 party sole custody. It must, therefore, award joint legal custody to the parties with physical custody, apparently not opposed by the defendant, to the plaintiff. The joint legal custody, however, will be subject to the conditions hereinafter set forth.
1. All major decisions affecting Daniel's health, education and welfare are to be discussed in advance by the parties, and if they are unable to agree, the decision making authority shall be allocated as follows.
 a. The plaintiff will have final authority concerning routine medical treatment and choice of local pediatrician except for emergency treatment while Daniel is visiting the defendant.
 b. Each party may involve Daniel in religious observances selected by him or her while Daniel is in that party's physical custody, but no formal affiliation with particular religious faith shall be made without the written agreement of both parties and of Daniel if he is old enough.
 c. So long as Daniel is attending public school, the plaintiff shall have the right to determine which school that is.
 If both parties wish him to attend private school and both parties are to share the cost thereof, they must both agree on the school he is to attend. If they are unable to do so, then the parties shall consult with a family relations officer in Stamford and abide by that recommendation or appeal it to the Superior Court for decision.
 If both parties agree Daniel should attend a private school with the defendant assuming full responsibility for tuition, board and room, then the defendant may select the school provided it is within 50 miles of the plaintiff's home.
 d. All other decisions including major medical treatment or surgery shall be decided by the parties; however, if they are unable to agree, the parties shall consult the family relations officer in Stamford for a CT Page 10572 decision with the right to appeal it to the Superior Court for decision.
2. Visitation shall be as follows:
 a. Every other weekend beginning with the end of the school day on Friday and ending at 6:30 p.m. on Sunday, the defendant to be responsible for picking up Daniel at school and returning him to the White Plains airport and the plaintiff being responsible for picking up Daniel at the airport and taking him to her home.
 b. Fourth of July, Labor Day and Thanksgiving, including the weekend which includes the holiday, shall be alternated on an annual basis with Thanksgiving, 1992, being spent with the defendant, including the weekend following Thanksgiving. The defendant may have visitation also on Memorial Day weekend to include the weekend instead of the weekend visitation immediately preceding it.
 c. The high holy days of Yom Kippur and Rosh Hashanah shall be spent with the defendant and Daniel shall be permitted to leave school early enough on the eve of the holy days to be with the defendant in Washington for the holy days. The Passover holy days may be alternated on an annual basis. In 1993, Passover may be included as a part of the defendant's weekend visitation with the child being returned home on the day after the first day of Passover by 6:00 p.m. at the White Plains airport.
 d. Daniel shall also spend the first night of Hanukkah with the defendant unless it conflicts with Christmas. In the event of a conflict, the holidays may be alternated with Christmas celebrated with the plaintiff this year and any other year in which there is no conflict and Hanukkah celebrated where there is one with the defendant.
 Where there is no conflict, the plaintiff shall have Daniel in her custody for the first seven days of the Christmas holidays and the defendant shall have him for the last seven days. CT Page 10573
 e. All the other holidays shall be alternated yearly except that the defendant may have visitation or Memorial Day weekend to include the Monday of that weekend instead of the weekend visitation immediately preceding it.
 f. Summer vacation shall permit each party to have two two week periods of vacation with Daniel with two or three days in between to enable Daniel to have some time to himself.
 In 1993 there appear to be 69 days between the end of school on June 24th and the beginning of school on September 1st or 2nd. For that year the visitation shall, therefore, be as follows: from June 25th to July 9th with the defendant; July 11th to July 25th with the plaintiff; July 27th to August 10th with the defendant; August 12th to August 26th with the plaintiff; August 27th to 29th with the defendant as school starts on September 1st.
 The parties may vary this schedule by written agreement which should be made by May 1st of 1993. Thereafter the parties shall agree on a vacation schedule by April 15 of the year before the vacation is to be spent. If they are unable to do so by that date, they shall refer the schedule to the family relations officer for a recommendation which they may accept or appeal to the Superior Court for a final decision.
 g. All pick up or Daniel in Greenwich during the school year shall be made by the defendant at Daniel's school at the close of the school day and all returns shall be to the airport at White Plains no later than 6:00 p.m. on the return day. The defendant shall be responsible for picking up Daniel at school and the plaintiff shall be responsible for transporting Daniel from the White Plains airport at the time indicated above.
 During the summer, all pick ups of Daniel shall be at the White Plains airport and the plaintiff shall be responsible for transporting Daniel to and from that CT Page 10574 airport. Pick up shall be no earlier than 10:00 a.m. in the morning and no later than 6:00 p.m. in the evening.
 h. Regular visitation, that is from Friday after school until Sunday night at 6:00 p.m. at the White Plains Airport every other weekend, shall be suspended during the summer and begun again on August 27.
3. The defendant is to keep the plaintiff informed of Daniel's whereabouts and the telephone number at which he can be reached at all times. The plaintiff shall likewise keep the defendant informed of Daniel's whereabouts when he is not in her home for more than a day and the telephone number at which he may be reached at all times.
4. The plaintiff may telephone Daniel and receive calls from him no more than once every other day and those calls shall last no more than 15 minutes.
5. Daniel shall be permitted to call his mother when he wishes between the hours of 8:00 a.m. and 7:00 p.m. but not on the same day his mother has called and no more often than once every other day except where there is an emergency.
6. While Daniel is on the telephone with his mother, the defendant shall remain out of the room and shall not return from time to time to see if Daniel is still talking.
7. Telephone calls made by the plaintiff to Daniel shall be paid for by the plaintiff while telephone calls from Daniel to the plaintiff shall be paid for by the defendant.
8. The defendant shall have the same right to telephone Daniel as has been awarded the plaintiff herein.
9. The defendant shall pay all costs of transportation to and from the White Plains airport to Washington and from the school to that airport. The plaintiff shall provide transportation to and from the airport to her home when Daniel is to be picked up at the airport or transported there.
SUPPORT
CT Page 10575 The question of the parents' support obligation is difficult to answer precisely. Both parties have, in the court's opinion, understated their income. Both have earning capacities beyond the income set forth in their affidavits.
In the plaintiff's case, she appears not to be attempting to earn what her training and talent suggest she might. However, since she cares for the minor child, it is clear that the time she may have to work is limited.
In the defendant's case there are several problems with the information he has provided the court through his affidavits and his testimony. In the first place, in his January, 1989 affidavit he showed a minus income of over $300,000.00 and a net worth of $2,230,000.00 (exhibit B; transcript of June 27, 1991, pp. 15-16). Twelve months later, December 31, 1989, he showed a net worth of $9,059,316.00 (exhibit J).
The defendant's April, 1991 financial affidavit reduced the value of his assets by almost $9,000,000.00 from his October 19, 1990 financial affidavit (exhibit F). None of the value which he placed on his assets were based on any documentation, appraisal, offer to sell or offer to buy. (Transcript, June 26, 1991, p. 41.) Some of the values in the 1990 affidavit purported to be based on appraisals and one on an offer to purchase. He acknowledged mistakes in his April, 1991 financial affidavit amounting to some $4,600,000.00. (Transcript, September 19, 1991, pp. 6-10.)
The defendant omitted assets and some income as follows: September, 1991 affidavit omitted an anticipated Great Neck receipt in the amount of $150,000.00; $5,000.00 to $10,000.00 in business expense reimbursements; interest expected to be received from his $250,000.00 investment in Damias.
The defendant's expenditures have been somewhat liberal. For example, in the six months prior to the trial he spent $400,000.00. In April of 1991 he made loans of $100,000.00 or $120,000.00. He listed his weekly expenditures in his September, 1991 affidavit at $4,800.00, but his net income listed on the same affidavit was $440.00. In that same year he invested $250,000.00 in a company called Damias. He claims that he has an oral agreement with his partner to prevent him from withdrawing any of the funds invested without the CT Page 10576 consent of his partner, apparently an attempt to put this money beyond his reach and that of his creditors including the plaintiff.
The defendant also expects to spend $2,000.00 a month on visitation according to his counsel's post trial brief.
Nevertheless, despite all of his financial difficulties which may reasonably have begun with his "minus income" in 1989, he has made no attempt and no plan to sell his home in Washington which he valued at over a million dollars with a $900,000.00 mortgage or his interest in the Gull Pond home which he valued at $250,000.00 and in which he says he has an interest of $90,000.00.
Moreover, it should he noted that, while all of the expenditures of the Gordon household are detailed in the defendant's affidavit, none of his spouse's income is set forth therein. The defendant also claims that he and his wife have a tenancy in the entirety of other assets in which he then estimates an interest of 50 per cent as his. He once stated that the Washington home was in the joint names of his wife and him but in the most recent affidavit treats that home as solely his.
Under these circumstances, the court finds that the defendant has access to income in excess of $1,500.00 a week and the plaintiff to the amount she has placed in her affidavit of $185.00 per week. Thus the total income per week is over $1,500.00 to which the guidelines do not apply. The guidelines, however, do suggest a minimum support order of $315.00 per week.
The plaintiff has asked for $350.00 per week as a support order. The defendant's offer is somewhat lower and includes payment for medical and hospital insurance, the fees he has paid for counsel for the minor child or for court appointed psychologists, nursery school expenses.
None of these in the court's opinion are appropriate deductions or credits against the defendant's obligation to support his son either under the child support guidelines or otherwise. The court has taken into consideration the expenses the defendant expects to incur for visitation.
While the defendant is presently in bankruptcy, there CT Page 10577 has been no information as to his present income or expenses except that he plans to spend $2,000.00 a month visiting Daniel according to his counsel's post trial brief. There apparently has been no decrease in his lifestyle nor has there been any movement to capitalize on any of his assets like the two houses.
Under those circumstances and given the minimal income of the plaintiff, the court finds the request for $350.00 a week as support reasonable and makes the following orders:
1. The defendant is ordered to pay the plaintiff the sum of $350.00 a week as child support.
2. The defendant is further ordered to provide medical and hospitalization insurance for the child. All medical, hospitalization, dental, psychiatric, psychological, prescriptive drugs, orthodontic, nursing and other medical expenses not covered by insurance shall he divided equally between the parents.
3. The defendant shall maintain the plaintiff as beneficiary of his life insurance for the benefit of the child, Daniel, in the amount of $150,000.00.
PAST SUPPORT
The plaintiff has also requested that the defendant pay past support in the amount which the court is presently ordering for present support since the time of the birth of the child. The statute in question provides that ". . . the court shall ascertain the expenses of lying in and of support and maintenance of the child until the time of rendering judgment. . . ." Connecticut General Statutes 46b-171. There was no evidence of the expenses of lying in, support and maintenance of Daniel since his birth. There was evidence that the lying in and hospital expenses had been paid by the defendant and that thereafter there had been agreements reached from time to time between the defendant and the plaintiff with respect to the amount of support she was to receive. This included $250.00 a month plus whatever expenses she could itemize for Daniel's care. More recently, the $250.00 a month has been raised to $500.00 a month beginning in 1991. The defendant has also paid the nursery school expenses, medical insurance, unreimbursed medical, made a retroactive payment of $2,250.00 in December of 1990. CT Page 10578
Under these circumstances, there appears to be no basis for ordering retroactive support, and the court so finds.
NAME CHANGE
The defendant has asked, also, that the court change the name of Daniel from Daniel Ivanina to Daniel Alexander Gordon.
Defendant's brief properly points out that Connecticut General Statutes 7-50 does contemplate the court placing the name of the father and surname of the child on the birth certificate. However, it does not contemplate or provide in so many words that that name be changed on the birth certificate. In fact, since there is a procedure for changing one's name, it would appear that that would be the exclusive remedy under the Latin maximum inclusio unius est exclusio alterius.
It seems to the court that it would be more appropriate to use the method expressly established by statute to change the child's name than to try to interpret the paternity statute to do that. Consequently, the request of the defendant that the child's name be changed is denied.
LEGAL FEES
The plaintiff has requested that the defendant pay her legal fees including those of Attorney Fraser.
This has been an extremely long and litigious matter with both sides appearing unreasonable, in the court's opinion, at times. It seems to the court that the initial agreement of the defendant to pay $250.00 a month plus whatever expenses Daniel had was considerably below the minimum required by the guidelines. In effect, it took this action to make a difference in the support payments, at least raising them from $250.00 a month to $500.00 a month. However, that was not accomplished until a year ago, 1991. In the interim, however, there apparently were negotiations during which the defendant offered to pay $1,000.00 a month and then later $1,650.00 a month.
Consequently, while it is clear that the paternity action in itself was necessary to change the amount of support the defendant was providing, the length of it it would seem CT Page 10579 could have been shortened had there been a willingness on the plaintiff's side to accept at least the last offer.
Under those circumstances, the court will order the defendant to pay one half of Attorney Ferro's fees and one third of Attorney Fraser's fees. Payments may be made over a period of time but for no longer than six months from date of the judgment.
The fees of the counsel for the child are hereby approved and the parties shall be jointly and severely liable for the payment of those fees. Those fees may also be paid over a period of time but for no longer than six months. The amount already paid by the defendant shall be deducted from the amount of his share.
The plaintiff's request for a lump sum payment of the support order is denied. There is no evidence that the defendant would be likely to fail to pay the order of the court. It is so ordered.
MARGARET C. DRISCOLL, JUDGE REFEREE